# Exhibit A

1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF NEW YORK

3   UNITED STATES OF AMERICA,      .  Docket No.
                                   .  21-CR-00466-ARR-3
4        Plaintiff,                .
                                   .
5           v.                     .  Brooklyn, New York
                                   .  Thursday, October 14, 2021
6   BENJAMIN CASTELLAZZO,          .  12:40 p.m.
                                   .
7        Defendant.                .
     . . . . . . . . . . . . . . .

8

9                    TRANSCRIPT OF BAIL HEARING
                BEFORE THE HONORABLE SANKET J. BULSARA
10                  UNITED STATES MAGISTRATE JUDGE

11  APPEARANCES:

12  For the Plaintiff:            DEVON LASH, ESQ.
                                  DOJ-USAO
13                                271-A Cadman Plaza East
                                  Brooklyn, New York  11201
14                                718-254-6014

15  For the Defendant:            JENNIFER R. LOUIS-JEUNE, ESQ.
                                  Law Office of Jennifer R.
16                                Louis-Jeune
                                  Duane Street
17                                7th Floor
                                  New York, New York  10007
18                                212-203-9058

19

20

21  Transcription Service:        Opti-Script, Inc.
                                  P.O. Box 77
22                                Winfield, PA 17889
                                  800-494-7500

23

24  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.
25

1          P R O C E E D I N G S

2          THE CLERK:  Okay.  Great.  This is a criminal cause

3    for bail application, USA v. Benjamin Castellazzo.  The case

4    number's 21-CR-466.  We're doing this hearing via Zoom video.

5          May I have the parties state their name for their

6    record?  For the Government, please?

7          MS. LASH:  Devon Lash for the United States.  Good

8    afternoon, Your Honor.

9          THE COURT:  Good afternoon.

10          THE CLERK:  Thank you, Ms. Lash.

11          And for the Defendant, please?

12          MS. LOUIS-JEUNE:  Jennifer Louis-Jeune for Mr.

13    Castellazzo.  Good afternoon, Your Honor.

14          THE COURT:  Good afternoon.

15          THE CLERK:  Thank you, Jen.

16          And do we have the pre-trial services on the phone?

17    Please state your name for the record.

18          MS. CARLSON:  Yes.  This is Amanda Carlson from

19    pre-trial services.  Good afternoon.

20          THE CLERK:  Thank you, Amanda.

21          And lastly, can we have the Defendant -- can you

22    state your full name for the record, please?

23          THE DEFENDANT:  Benjamin Castellazzo.

24          THE CLERK:  Thank you, Mr. Castellazzo.

25          Okay, Judge Bulsara.

1          THE COURT:  Okay.  Mr. Castellazzo, I'm Judge

2    Bulsara.  Can you see and hear me?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Okay.  Great.

5          Ms. Louis-Jeune, does Mr. Castellazzo waive any

6    right that he may have to have this proceeding occur in

7    person and proceed via video?

8          MS. LOUIS-JEUNE:  Yes, Your Honor.

9          THE COURT:  Okay.  So I just want to make a couple

10   of things -- confirm a couple of things at the outset.  I

11   have received the following document, and I want to make sure

12   that everybody has all of them.  I have a copy of the

13   indictment.  I have a copy of the initial detention letter

14   proffered by the Government.  I have the pre-trial services

15   report.  I have Mr. Castellazzo's request for bail in -- a

16   written submission in advance of this hearing.  I have the

17   Government's response to that.  And I also have a transcript

18   of the hearing before Judge Merkl that took place in

19   September.

20         Does everybody have those documents?  Does the

21   Government have those documents?

22         MS. LASH:  Yes, Your Honor.

23         THE COURT:  And Ms. Louis-Jeune, you have all of

24   those documents as well?

25         MS. LOUIS-JEUNE:  Yes, Your Honor.

1    THE COURT:  Okay.  So I appreciate the submissions.

2  There's a little bit of -- to be perfectly honest -- things

3  that are unaddressed and ships that are passing in the night

4  and some assessments that beggar belief.  I'll get to each of

5  those in a moment.

6    But let me start at the outset with the following.

7  I've read the submissions.  Obviously you're welcome to let

8  me know what -- if there's anything that's not in submissions

9  that you'd like to reiterate.  But if there isn't, I'd like

10 to proceed with a series of questions in order to elucidate

11 what action to be taken here.

12    MS. LASH:  Devon Lash for the United States.

13 That's fine, Your Honor.  We're happy to rest on our papers

14 and answer any questions you may have.

15    THE COURT:  Okay.  Ms. Louis-Jeune?

16    MS. LOUIS-JEUNE:  Your Honor, if I could just add a

17 few things that were not in the submission.

18    THE COURT:  Just give me one moment.  I left my pad

19 on my desk.  I'll be right back.

20    Okay.  Go ahead.

21    MS. LOUIS-JEUNE:  Your Honor, I would just like to

22 add that counsel has not been able to meet with Mr.

23 Castellazzo since his arrest in this case last month.  He's

24 been held in quarantine since his arrest.  And we have only

25 been allowed one phone call for 15 minutes with him.  So as

1  far as the Government's questions regarding what his exact

2  medical conditions are and whether they're being taken care

3  of, I don't have that information because I haven't been able

4  to speak with my client.

5  THE COURT:  Let me just address this point -- and

6  this is what I meant by the Government's representations

7  about the conditions at MDC that defy credibility, beggar

8  belief, and undermine the credibility of the entire U.S.

9  Attorney's Office as far as I'm concerned.

10  I'm not pleased with what the Government said and

11  the dismissive way that it addressed the conditions of the

12  MDC.  I'm not pleased in the slightest.  And given what's

13  going on there, rather than admitting the horrific,

14  horrendous, despicable, untenable conditions at the MDC and

15  working with counsel to alleviate them, there's a backhanded

16  attempt to say, well, the conditions haven't been specified

17  and they're routine and they're not serious.

18  Ms. Lash, you should not put that in a submission.

19  I'm offended by it, and the U.S. Attorney's Office knows

20  better than that.  I'll make this clear at the outset when we

21  get to the medical conditions.

22  Ms. Louis-Jeune, if your client can't get medical

23  treatment that he needs, putting aside the bail question,

24  which is a separate question in my mind -- I realize you link

25  the two.  I will writ him out, okay -- he may be in handcuffs

1    by the U.S. Marshals -- to have him treated at an appropriate

2    medical facility.  That's number one.  Okay?

3         So if the conditions that are present are untreated

4    and he's not getting medical care, I will writ him out.  And

5    you just need to make an application.  And that's on the

6    defense counsel.

7         Now, if you can't meet with him, that's a serious

8    problem, and if I have to writ him out to have a meeting

9    organized at the courthouse where you can meet with him in

10   the Marshals' pen, I'm happy to do that.  I don't

11   know -- just to bracket this for a moment -- I don't know

12   whether he's -- I assume he's in the Marshals' pen right now.

13   If you'd like him to be held there after this conference so

14   you can come to the courthouse and meet with him, we can

15   arrange that.

16        MS. LOUIS-JEUNE:  Thank you, Your Honor.  I

17   appreciate that.  I would need to speak with my associate to

18   see if she's available to come to the pens today, but we

19   would appreciate the ability to be able to meet with Mr.

20   Castellazzo.

21        THE COURT:  I think that needs to be done -- I'll

22   tell you since he's already in the courthouse, okay, I would

23   suggest you strongly figure out how to take advantage of that

24   opportunity.  Now, if that means that you need to -- we need

25   to arrange a Zoom conference so that you can do that, that

1  can be arranged.

2  MS. LOUIS-JEUNE:  Your Honor, my associate is

3  available to meet with him in person.

4  THE COURT:  Okay.  So whatever arrangements need to

5  be made, I expect them to be made so that he can stay in the

6  Marshals' pen.  I don't know if the Government can arrange

7  that or not, but in light of the fact that it's been over a

8  month since he's been arrested and there's been a 15-minute

9  phone call, arrangements should be made in the Marshals' pen

10  for defense counsel to meet with her client.

11  MS. LASH:  Judge Bulsara, this is Devon Lash for

12  the United States.  May I just jump in briefly?  This is the

13  first that the Government has heard that Ms. Louis-Jeune has

14  (indiscernible) client.

15  THE COURT:  Excuse me.  Hold on, Ms. Lash.  There

16  are people who are talking in the background.  If you don't

17  put yourself on mute or if you keep talking, you will be

18  kicked of the conference.

19  Ms. Lash, I understand.  I wasn't lambasting the

20  Government for inability to arrange meetings, and I'm

21  not -- I don't put the inability of Ms. Louis-Jeune to meet

22  with her client.  That is not something that I expected the

23  Government to address or deal with at all.  And I understand

24  that and I appreciate that.  But this is not a fault -- this

25  part is not a fault of the Government.

1          MS. LASH:  I understand, Your Honor.  And point

2    taken about the MDC.  That's all I'll say.

3          THE COURT:  Okay.  But Ms. Lash, I don't know if

4    you're in contact with the Marshals' pen and can -- there's

5    also a pen available on a different floor.  If that needs to

6    be -- I don't know the number of new arrests this afternoon.

7    I think that they're limited.  And so if we need to do that,

8    I'd like this to be arranged.

9          MS. LASH:  Yes, Your Honor.  We'll happily work to

10   facilitate that.

11         THE COURT:  Okay.  Okay.  I hope that addresses

12   that concern.  And again, I don't expect the Government to do

13   anything about something they don't know about.  The medical

14   issues and the conditions of the MDC is a whole other

15   category.

16         But if you're having issues with meeting with your

17   client, you need to tell the Court or tell the Government

18   and/or ideally both.

19         MS. LOUIS-JEUNE:  Thank you, Your Honor.

20         THE COURT:  Okay.

21         MS. LOUIS-JEUNE:  I'm happy to follow up with any

22   of the Court's questions and ask that I be allowed to explain

23   if there's anything further after the Court has questions.

24         THE COURT:  So let me ask this.  There's a

25   threshold question about whether or not the conditions for

1  the detention hearing and detention have been satisfied in

2  this case, okay?  And I think this is where the parties I

3  think are a little bit ships passing in the night.

4       Ms. Lash, are you contending that under the

5  elements definition of 3142(f) for a crime of violence, Mr.

6  Castellazzo has been charged with a crime of violence?  Or

7  are you only asserting that under the categorical approach

8  the extortion would be a crime of violence that would create

9  the necessary prerequisite to hold a detention hearing?

10       MS. LASH:  Your Honor, the Government is asserting

11  that this is a crime of detention under the second

12  definitional prong in the Bail Reform Act of a crime of

13  violence, and that is that this crime carries a substantial

14  risk that force will be used.

15       THE COURT:  Okay.  So then my question is, why is

16  the Government not taking the position that the first clause

17  applies?

18       MS. LASH:  Because under that clause, the addition

19  of under color of authority would under the categorical

20  approach, in my understanding, strike that from the

21  definition.

22       THE COURT:  Meaning making it unavailable?

23       MS. LASH:  That's right, Your Honor.

24       THE COURT:  Okay.  Sorry to jump back and forth.

25  But Ms. Louis-Jeune, you say in your papers -- this is why I

1    wanted to clarify what the Government's position was -- that

2    the Government doesn't even assert that under the categorical

3    approach, okay, extortion is a crime of violence that would

4    permit the detention here.

5         But I'm just looking at, you know, the original

6    detention memo, okay?  And I think it quite, you know -- and

7    so I wanted to understand the basis for that position in

8    light of the fact that, you know, I think in a couple of

9    places it is asserted that these are crimes that qualify.

10   And, you know, in light of what I think is at least the

11   Government's position that the first prong could not apply

12   and quite clear that it couldn't apply, I don't know how else

13   to read the Government's papers other than saying, you

14   know -- footnote 6 on page 29 as clearly making the argument

15   that the Government's now relying on.

16        MS. LOUIS-JEUNE:  So Your Honor, it's my

17   understanding that the Government is relying on a case that

18   says that the second prong -- even if the second prong could

19   be satisfied, they still have to engage in a categorical

20   approach.  And under that categorical approach for the second

21   prong, extortion by its nature does not involve a risk of

22   force because it can be committed under the color of official

23   right.

24        And it's not a matter of how -- it's a matter of

25   how the law defines the offense, not how an individual

1   offender -- not how Mr. Castellazzo may have committed that

2   crime.  The fact that it could be committed under color of

3   right makes it outside of the categorical approach and not a

4   crime of violence.

5          THE COURT:  And so when you say -- excuse me.  And

6   I'm just flipping back and forth between the papers.  When

7   you say the Government is relying on a case that -- which one

8   are you talking about?

9          MS. LOUIS-JEUNE:  So in Watkins, which the

10  Government cites, that was a clear case of a crime of

11  violence, a felon in possession, because by its nature that

12  involves a risk of force.

13         But under Ciccone, which is a 2002 case, which the

14  Government relies on to say that extortion is a crime of

15  violence, the Government doesn't take that extra step of

16  doing the categorical approach.

17         And Ciccone, which was in 2002, had left open the

18  question of whether the Bail Reform Act's crime of violence

19  requirement was satisfied when the risk of force results from

20  conduct or -- from the conduct or the nature of the

21  defendant.  And the Second Circuit has now held that you look

22  to the law, not to the specific conduct of the defendant.

23         THE COURT:  And that case is what?

24         MS. LOUIS-JEUNE:  That is Smith v. Barr, Second

25  Circuit, 2020.

1          THE COURT:  What's the cite on that case?  I mean,

2     I understand the proposition, and I accept the proposition.

3     I just want to read the case to understand in which context

4     that arose.

5          MS. LOUIS-JEUNE:  If I could just look at my

6     application.

7          THE COURT:  Go ahead.

8          MS. LOUIS-JEUNE:  I'm sorry, Your Honor.

9          MS. LASH:  Your Honor, may I respond briefly?

10          THE COURT:  I promise you, Ms. Lash, you'll have

11     plenty of time.

12          MS. LASH:  Thank you.

13          MS. LOUIS-JEUNE:  The cite for that case is 809 F

14     Appendix 54 at 55.

15          THE COURT:  While I'm looking at that, what I -- if

16     you look at the Government's submission, the original

17     submission, okay, at page 29, it cites Cicale, among others

18     from the Eastern District of New York.  I take it your

19     argument is -- and this is the part that I need to

20     understand -- you look at the nature of the offense as

21     written not as applied.  Let's call it that.  Okay?  And when

22     I do that, I have to look at the statute and employ the

23     categorical approach.

24          But what is the case that stands for a necessary

25     predicate to your argument that extortion, because it may but

1    does not necessarily employ violence, does not constitute a

2    crime of violence under the categorical approach?  Because I

3    take it that the case you cited for me just stands for the

4    general proposition that, you know, you don't look at it

5    as -- the conduct engaged in.  You look at the statute in

6    order to determine the nature of the offense.

7              MS. LOUIS-JEUNE:  I believe it's a general

8    proposition, Your Honor.  I don't have a specific citation to

9    a case.

10             THE COURT:  Okay.  And is there any statute akin to

11   extortion -- in other words, I understand that the question

12   of extortion may not have been resolved by a case that you

13   can cite to me on this question if I just look at the

14   statute, apply the categorical approach, and figure out

15   whether it's a crime of violence because it involves may

16   versus necessarily, right?

17             Are there other statutes or cases involving other

18   statutes that you can point to me that from where I can draw

19   the inference that because there are multiple avenues that

20   the crime can be committed in, some of which involve

21   violence, some of which do not, it fails the categorical

22   approach and would not qualify?

23             MS. LOUIS-JEUNE:  I was on mute.  I'm sorry.  I

24   believe that there are fraud offense cases which address such

25   a proposition.  I do not have those cases before me at this

1  moment.

2          THE COURT:  Okay.

3          MS. LOUIS-JEUNE:  Our main argument here is that

4  the Government doesn't engage in the approach that's

5  currently required under the law in the cases that they have

6  cited.

7          THE COURT:  What does that mean?  I mean, does that

8  mean -- look, if I decide that under the categorical approach

9  extortion collection of credit qualifies as a crime of

10  violence, okay, under the residual clause of the Bail Reform

11  Act, the fact that they don't engage it, meaning they don't

12  say certain words or make certain forms of argument, is that

13  a procedural flaw that results here?  I mean, in other words,

14  what is that -- that's the part I don't understand.  I have

15  to make sure the Government every time they, you know, come

16  forward seeking a detention hearing walk through the

17  categorical affirmatively in their request for detention or

18  at the hearing itself?

19          MS. LOUIS-JEUNE:  I believe that that should be a

20  requirement that the Government show that what they are

21  asking for fits under the F factors that are required in

22  trying to detain a person.  As far as extortion goes, it's

23  specifically right there in the statute that it can be

24  committed under the color of official right and under the

25  categorical approach that puts it outside of the realm of

1  fitting into the crime of violence because there is a way

2  that it can be committed that is not violent.

3        THE COURT:  Okay.  And what about the fact the

4  Government cites 18 U.S.C. 89 -- excuse me -- 891(7), which

5  defines extortion.  It means as any means which involves a

6  use of violence, express, implicit, et cetera, which the way

7  I read that definition, right, is that it only qualifies if

8  it uses violence or other criminal means.  Now, you're saying

9  that because it has other criminal means it's not necessarily

10 crime of violence and therefore it fails the categorical

11 approach?

12        MS. LOUIS-JEUNE:  Yes, Your Honor.

13        THE COURT:  Is there any case that stands --

14        MS. LOUIS-JEUNE:  There are other ways in which it

15 could be -- this crime could be committed.

16        THE COURT:  And is there any case that stands for

17 that proposition with respect to extortion or anything else

18 which says that because there are other means, nonviolent

19 means -- maybe this is just another form of the same question

20 I've asked.  That, you know, there's not a basis here.

21 There's not a case that you can cite to me.  It's just the

22 sort of either a plain meaning or what it necessarily means

23 to engage in the categorical approach?

24        MS. LOUIS-JEUNE:  I do believe that we cite several

25 in our submission.  I'm sorry.  I'm just looking.

1          THE COURT:  Okay.

2          MS. LOUIS-JEUNE:  We cited the case of United

3 States v. Kennedy on page 5 of our submission, which again, I

4 believe it is another way of asking the same question, taking

5 into account the statute for extortion, that the offense

6 doesn't fit within the force clause because it can be

7 accomplished under color of official right and does not

8 require the use or threatened use of physical force.

9          THE COURT:  Okay.  I understand.  I'm going to look

10 at Kennedy again.

11          Ms. Nash -- Ms. Lash.  I'm sorry.  I'm sorry.  My

12 apologies.  Go ahead.

13          MS. LASH:  No problem, Your Honor.  I think the

14 confusion here stems from a misunderstanding or a misreading

15 from defense counsel of Davis.  So United States v. Davis,

16 the holding there is that the force clause lives on and a

17 categorical approach must be applied and the residual clause,

18 the one that the Court asked us at the start of this hearing

19 whether the Government was relying on to show that extortion

20 is indeed a crime of violence, that was unconstitutional.

21          So this is where -- so the categorical approach is

22 only applied if you're proceeding under prong 1 of a crime of

23 violence.  Here, the Government proceeds under prong 2, that

24 by its nature there is a substantial risk that force will be

25 used to commit the crime.  There is no categorical approach

1    implied --

2           THE COURT:  That's a bad misreading of Watkins.  I

3    think it --

4           MS. LASH:  Your Honor --

5           THE COURT:  -- is a bad misreading of Watkins

6    because it's not a -- the question here is not -- I'm happy

7    to be disabused of this notion, okay, but the question is not

8    whether or not this is an unconstitutional as applied

9    challenge.  Clearly that would fail, right?

10          MS. LASH:  Yes.

11          THE COURT:  But in Watkins, after the sections that

12   you cite, the Second Circuit goes on to apply the categorical

13   approach on the residual clause.

14          MS. LASH:  And on the categorical -- then, Your

15   Honor, on that understanding, the categorical approach

16   applied to the residual clause, whether there is a

17   substantial risk that violence will be used in this, there's

18   five definitions of how extortion can be committed.  Four of

19   those --

20          THE COURT:  Hold on.  But I want to go to your

21   original -- you're backing away from that argument because

22   that's not what the case says.

23          MS. LASH:  Your Honor, then I --

24          THE COURT:  I mean, page 161 of Watkins, having

25   concluded the residual clause of 3142(f)(1)(A) of the Bail

1    Reform Act is not unconstitutionally vague, we must now

2    address how to interpret this residual clause.  And then for

3    the rest of the opinion applies the categorical approach.

4            MS. LASH:  That is correct, Your Honor.  That's a

5    correct citation.  That is what the Second Circuit held.  I

6    was sort of defining the categorical approach differently in

7    my head as I explained it to you.  But I'm happy to move on

8    and explain why under the categorical approach to the

9    residual clause as applied in the Bail Reform Act that this

10   is a crime of violence.

11           THE COURT:  Fair enough.  I just wanted to make

12   sure that I understood your argument because frankly I was

13   confused by -- this is the part I was confused by your papers

14   because I read Watkins, and it doesn't say that.

15           So I'm happy to hear you on this latter point as to

16   why it is a crime of violence.

17           MS. LASH:  Thank you, Your Honor.  So extortion

18   involves a substantial risk of violence, that force against

19   person or property may be used in the course of committing

20   offense.  There are two cases that the Government cites in

21   its papers.  The Gotti case, where the court writes extortion

22   by its very nature is considered to be an act of violence

23   under the Bail Reform Act.  And the Dafiti (ph.) case.  The

24   offense extortion is a crime of violence because its

25   completion often involves the threat of physical harm.

1    Now, extortion as defined -- and this is in the

2 Government's papers -- means obtaining the property from

3 another with his consent induced by wrongful use of actual or

4 threatened force, violence, or fear or under color of

5 official right.

6    Four of those five descriptions involve the

7 commission of violence, which is why that under the

8 categorical approach as set out by Watkins, there is a

9 substantial risk that physical force against person or

10 property would be involved in the commission of an extortion

11 crime.

12    THE COURT:  Okay.  I just want to make sure

13 I -- what was the citation for the various items?  I was

14 reading page 3 of your brief where you cite the Gotti case.

15    MS. LASH:  Which citation?  Do you want the

16 citation for the Gotti case, Your Honor?

17    THE COURT:  No, no.  I have the Gotti case.  I want

18 the --

19    MS. LASH:  Okay.

20    THE COURT:  -- where you said four of the five are

21 met here, I didn't know what case you were referring to

22 there, whether it was in your original -- the one from the

23 original submission or in your subsequent submission.

24    MS. LASH:  It's in the submission that you're

25 looking at on page 3.  And when I say four of the five, I'm

1    referring to the definition of extortion under the statute,

2    which is cited -- it's 1951(b)(2).

3            THE COURT:  Okay.  Thank you.  I see that.  Okay.

4    Anything else on this point?

5            MS. LASH:  No, Your Honor.

6            THE COURT:  Okay.  Ms. Louis-Jeune, anything else

7    at this point?

8            MS. LOUIS-JEUNE:  Your Honor, I'd just like to

9    follow up again on the Watkins case which stated that, you

10   know, Congress clearly intended for the Bail Reform Act to

11   limit the availability of detention hearings to individuals

12   who are actually charged with certain enumerated offenses.

13   And we'll rest on the other arguments that we have made

14   regarding the lack of a crime of violence being involved in

15   this case.

16           THE COURT:  Okay.  I appreciate the argument.  I've

17   asked some hard questions.  I also appreciate the

18   inventiveness of the argument raised by defense counsel.

19   It's a good argument, but I think it fails under the law.

20           I think the cases cited by the Government establish

21   that extortion would qualify as a crime of violence under the

22   residual clause of the definition of violence under the Bail

23   Reform Act and therefore satisfy 31.  The F would create an F

24   factor that would allow both a detention hearing and

25   detention.

1          While I recognize that there is at least one case,

2     the Kennedy case from the -- which at least nominally points

3     in the direction of the Defendant's argument here, I will say

4     that, you know, it is relying on a sentence there really that

5     says because extortion under color of official right need not

6     be effected through violence, not all crimes under the Hobbs

7     Act need be violent crimes.  Fair enough.

8          But here what the Government has charged and the

9     definitions of the crimes the Government has charged under

10    the categorical approach extortion here is as they define it,

11    you know, satisfies the element of that approach.  And I

12    don't see a case standing for an opposite proposition.  And

13    indeed, it appears the remainder of the cases that the

14    Government relies on, which are from this circuit, you know,

15    establish that it would meet the categorical approach.  Even

16    the quote/unquote new categorical approach that is you just

17    look at the offense as it's defined in its nature, not as

18    applied to the particular conduct that the defendant is

19    alleged to have engaged in.

20         You know, so for those reasons, I'm rejecting that

21    argument.  Now, any question about any aspect of this?  We'll

22    obviously go to the main detention part of the hearing in a

23    moment.

24         MS. LOUIS-JEUNE:  No, Your Honor.

25         MS. LASH:  No, Your Honor.

1          THE COURT:  Okay.  So Ms. Louis-Jeune, I want the

2     Government -- much of your argument about why your client

3     should be released is that on, you know -- about whether or

4     not he's an ongoing danger to the community relies on a

5     pretty vociferous argument that he doesn't use a cell phone,

6     he doesn't communicate with others, that the Government is

7     exaggerating his role in the crime family, and that he has

8     not -- and that the indictment only alleges that he was at

9     two meetings in November of 2020 at which other members were

10    there.

11          The Government, however, cites to and quotes a

12    series of recorded phone calls from the MDC that took place

13    three days after his arrest.  Any response to that?

14          MS. LOUIS-JEUNE:  Certainly, Your Honor.  As far as

15    the phone calls that the Government cites to, the

16    Government's interpretation of these calls is just that.

17    It's the Government's interpretation.  And I think that these

18    calls could be easily explained in other ways.

19          As for the first call that they cite to, this is a

20    typical first call made by anyone incarcerated.  He's asking

21    someone to get him money to put on his commissary.  As we all

22    know, the MDC does not provide basic hygiene or other things

23    to people who are incarcerated, and he needs money on his

24    commissary.  That money comes through Western Union.  That's

25    a basic call.  There's nothing nefarious there.

1          Mr. Castellazzo also obviously knows that these

2   calls are being recorded.  So to say that he's directing

3   someone to do something, they would have to say that every

4   person at the MDC who enters that jail directs people to help

5   them out by putting money on their commissary, something he

6   can't do on his own.

7          As far for the second call, again, he's getting

8   things -- he's asking for help.  He's incarcerated.  When he

9   was arrested, his apartment was left wide open.  He's asking

10  people to help with securing his belongings.  And as far as

11  the phone, you know, smartphone, cell -- there's a difference

12  between a smartphone and a cell phone.  And asking someone to

13  get rid of his phone -- I mean, he doesn't have a use for a

14  phone.  He's in jail.

15         And if the Government truly thought that that phone

16  had any evidentiary value, we are sure it would have been

17  seized at the time when he was arrested.  So I really take no

18  weight in these two calls that the Government has cited.  And

19  surely if they had something more of him trying to direct

20  some sort of illegal activity, they would have put it here.

21  But this is what they have, and that is surely not enough to

22  detain a person when there are certainly more than enough

23  available conditions.

24         THE COURT:  Okay.  All right.  So I understand your

25  interpretation of that.

1          Ms. Lash, you want to say anything about --

2          MS. LASH:  I would.  Thank you, Your Honor.  So the

3    point is not that the Defendant was trying to get money for

4    his commissary account.  The point is that he's contacting a

5    known member of the Colombo crime family at a known location

6    where he supervised this ongoing extortion scheme.

7          And there's another call on September 20th that's

8    not excerpted in quotes, but also he directs a family member

9    to get in touch with that same known member of the Colombo

10   crime family.  So it's not what's being said, it's who he's

11   communicating with and what he's asking for.

12         I have to just disagree with the interpretation of

13   the third call.  It speaks for itself.  He says --

14         THE COURT:  I'm sorry.  When you say the third

15   call, is that --

16         MS. LASH:  Your Honor, I mean the call that is

17   transcipted on page 5 of the Government's brief that occurred

18   on September 20th with a member of --

19         THE COURT:  Okay.

20         MS. LASH:  -- the Defendant's family.

21         THE COURT:  Yeah.  Okay.  I was confused about when

22   you said third because I saw only two excerpted.  Okay.

23   September 20th.  I'm with you.  Go ahead.

24         MS. LASH:  And Your Honor, in that call, I mean, it

25   speaks for itself.  He says, with my cell phone, when you get

1  it, just throw it away.  If, as Ms. Louis-Jeune, said, you

2  know, he had no use for a cell phone, why not cancel the

3  plan, turn it off, do something?  Throw it away?  That

4  evinces a guilty conscience and one to keep this evidence

5  away from the Government.

6          And finally, I'll just say Ms. Louis-Jeune said his

7  apartment was left wide open.  That's simply not true.  In

8  accordance with FBI policy, the apartment was secured after

9  Mr. Castellazzo was arrested.

10         THE COURT:  Okay.  Ms. Louis-Jeune, one thing your

11 papers don't address -- admittedly, the Government doesn't

12 address it.  But at this point, your client is the one that

13 probably needs to, which is Judge Merkl made a series of

14 extensive findings, okay, on the record about Mr.

15 Castellazzo's prior criminal history, the nature of the

16 offense, what he's charged with, all of the factors under the

17 Bail Reform Act.

18         And, you know, you're not arguing that any of that

19 is wrong.  At this point, I take it you're saying we've come

20 up with a new package that ought to satisfy the risks

21 attendant to what Judge Merkl found?

22         MS. LOUIS-JEUNE:  No, Your Honor.  We don't believe

23 that he is a risk.  And --

24         THE COURT:  I understand that on an ultimate

25 conclusion basis, but, you know, you're asking me to do a

1  kind of de novo review of another magistrate judge's

2  determination of the nature of the offense, you know, et

3  cetera, et cetera.  And, you know, why should I do that?

4        MS. LOUIS-JEUNE:  Well, Your Honor, because Mr.

5  Castellazzo does have a documented criminal history.

6  However, this is a new case.  There are attendant

7  circumstances that have not existed before, such as COVID,

8  his health, and his inability to be able to review,

9  meaningfully review, discovery, a complete lack of access to

10 counsel.  And also we believe there is a set of circumstances

11 that -- the Bail Reform Act requires us to look to see if

12 there is a set of circumstances.  And there can truly not be

13 said to be no set of circumstances that would not assure the

14 safety and the reappearance of Mr. Castellazzo.

15       He has one supervision issue back from 1968.  He

16 has shown up to all of his court appearances.  There's no

17 reason to believe that now at 84 years old he's going to

18 abscond.  The Government, if they don't want him speaking on

19 the phone, there are conditions for that.  There are lists in

20 other cases that I have done, organized crime cases, where

21 people are not to associate with certain people.  He would

22 agree to doing that.

23       It's just untenable that there could be nothing,

24 absolutely nothing, that could be worked out in order for

25 this man to be able to go home rather than risking his life

1  inside of the MDC.

2          THE COURT:  Okay.  Let me just address the health

3  concerns because this lurks in the background here.

4          And Ms. Lash, I apologize for getting heated

5  earlier because I think it reflects -- it was out of the fact

6  that judges of this court are disgusted with the MDC and the

7  conditions that are present there.  I know the Government's

8  not trying to apologize for them or gloss them over, but at

9  this point the Government should not be saying, you know,

10  something akin to the application provides no specifics as to

11  why BOP cannot treat the very common health conditions

12  affecting this Defendant and it contains no specific

13  allegations about any specific medical need of the Defendant

14  that has not been met.

15          I mean, first of all, it glosses over the quite

16  serious and substantial conditions that Defendant is in.

17  Okay?  And second, you know, we have no confidence that the

18  toilets work.  There was no electricity for days.  They don't

19  have drinking water.  So the idea that health conditions of

20  Mr. Castellazzo would be met, even the most basic ones, is an

21  argument with no credibility.  And so I just think it

22  undermines the Government's credibility to come in and say

23  something like that given what's gone on at the MDC.  And

24  judges are sick of hearing that.

25          And so I think the better course is to simply say,

1  you know, please identify what those conditions are, and we

2  will attempt to ameliorate them in the best way we can.

3  Okay?

4          Now, Ms. Louis-Jeune, I don't discount your

5  client's age and his serious health circumstances.  And the

6  conditions at the MDC have been well documented to be

7  horrific, unsustainable, despicable, I could go on.  But as

8  I've said, I will writ your client out to get medical

9  assistance that he needs if he's not getting it, you know.

10         And if the warden's not capable of writting out

11 your client, he can present himself in my courtroom.  But

12 that's the way to solve the health issue.

13         As to the counsel issue, we've dealt with it for

14 today.  You know, I can't blame the Government, let alone the

15 MDC at this point.  I mean, maybe I can blame the MDC without

16 being alerted to that.  Happy to make whatever application so

17 that your client can review discovery, come to pens at the

18 courthouse, wherever it may be, to access discovery.  That's

19 the way I'm dealing with those issues.

20         Let me talk about the release and the bail itself.

21 Okay?  Judge Merkl made a series of extensive findings at the

22 prior hearing.  And, you know, I see nothing to at least

23 undermine, let's just say, the factual findings.  Maybe I

24 don't call them factual findings, but the determinations that

25 she made at that hearing.

1      Now, and I haven't seen anything in the record to

2  suggest that those findings, you know, are wrong.  I want to

3  be clear about what I'm talking about so that

4  there's -- yeah.  On pages 29, 30, and 31, there's nothing to

5  suggest that any of that was wrong.

6      Now, at the same time, Judge Merkl did say that a

7  substantial package could be provided.  And this goes to your

8  point about conditions.  $150,000 package secured by two

9  suretors is not anywhere close to what a substantial package

10  would be given the amount of time that your client is facing

11  in jail and what the proffers of the weight of the evidence

12  and his substantial criminal history.

13      So, you know, if we were in some other magnitude of

14  a proffer of financing and suretors, maybe we could begin to

15  have a discussion.  But this is nowhere close given the

16  charged conduct and the substantial criminal history.

17      And I will add I am, you know -- while I was taking

18  a somewhat skeptical view of the -- given what your

19  presentation about what the Government said about what Mr.

20  Castellazzo was doing on those meetings in November -- but,

21  you know, reading what the indictment says, okay, and reading

22  what the Government's detention memo says, you know, he's

23  continuing to affiliate with other individuals who are

24  charged with serious crimes that arise out of that meeting.

25  Okay.

1        And I realize having -- as you said before -- for

2   having dinner with someone is not alone in and of itself a

3   problem.  If that's all it was, I understand your point.  But

4   the Government alleges, and I haven't heard a rebuttal, that

5   at that meeting extortion and racketeering schemes were

6   enacted and followed through on.  So it's not just having a

7   dinner meeting with someone.  So I take the Government's

8   charges as being more serious.

9        Ms. Louis-Jeune, I'll give you a moment.

10        And I'll say, finally, as to the last -- the calls

11   that the Government has put forward in their detention

12   letter, I agree with you.  The first one appears to be on its

13   face one where someone is asking for money on their

14   commissary.  Fair enough.  The second one is -- you've made a

15   valiant attempt, but the second one is simply on its face

16   highly problematic.  Getting rid of a cell phone, directing

17   the people meet up at a certain place, do certain things,

18   it's not clear at all that it has the kind of innocent

19   characteristics that you would suggest.

20        If the Government is wrong about that, you can

21   submit an affidavit from the person he was talking to.  But,

22   you know, reading that transcript, I'm with you on the first

23   characterization.  The second one, I simply can't agree with.

24        Please go ahead.

25        MS. LOUIS-JEUNE:  Your Honor, I mean, I'm not

1  really required to offer a rebuttal to the Government's

2  alleged evidence.  How would I do that?  I haven't had a

3  chance to speak with my client.  And also --

4        THE COURT:  All that means -- hold on.  Hold on.

5  Let's be clear.  The Government can move by proffer.  You can

6  move by proffer.  I realize that you have had not an

7  opportunity to discuss with your client.  I learned about

8  this at the beginning of the hearing.  We didn't know about

9  it before.  You can meet with your client.  If that's wrong,

10 you can make your own proffer about it.

11        And I realize that puts you in a delicate position.

12 You can make another bail application and say, you know what,

13 the Government was wrong about this.  I've met with my

14 client.  This is what it was.  But that doesn't mean that I

15 can't accept the Government's proffer.

16        But go ahead.

17        MS. LOUIS-JEUNE:  As for the Government's proffered

18 evidence in its detention memo regarding Mr. Castellazzo's

19 actions, they speak of someone saying he was somewhere, which

20 I do not believe is strong evidence.  And then another time,

21 he was somewhere.  They don't proffer any evidence about what

22 actually happened at those meetings, only what they believe

23 happened there.

24        And we don't know what happened in those actual

25 conversations.  Again, they're Government allegations.  And

1  Mr. Castellazzo seems to be being held in based on his

2  alleged ability to speak to people on a telephone.  And

3  again, I reiterate, you know, there are conditions that can

4  resolve that.  He's speaking on a phone right now that's a

5  recorded line.  And the Government is alleging that he's

6  doing things he's not supposed to, which again I would

7  dispute.

8           It's just difficult that, you know, the Government

9  sees things in a certain way.  And no matter what defense has

10 to say or that there could be an innocent explanation doesn't

11 matter as long as the Government believes that there could be

12 a nefarious one.  And I --

13          THE COURT:  Let me be clear here.  I agree that the

14 Government's acting on proffers, right?  But let's be clear.

15 The meetings are the basis of charged conduct for which there

16 are severe penalties that are applied.  So it was, you know,

17 yes -- and your client's entitled to the presumption of

18 innocence.  But let's be clear about what the detention memo

19 says and what you claim it doesn't say, right?

20          I mean, in April and April 20th of 2021, law

21 enforcement officers surveilled a meeting with your client to

22 receive reports about the scheme.  Now, you can say it didn't

23 happen that way.  You can say that that's not correct.

24 That's the detention memo at 12.

25          And the detention memo at 10 says that law

1  enforcement officers surveilled the meeting, observed your

2  client attending the meeting.  And so, you know -- and they

3  proffer what was discussed at the meeting.  Okay.  And the

4  meeting was -- who attended, including your client, was

5  confirmed according to the Government by cell site location

6  information, wire taps, license plate readers, physical

7  surveillance among other things.

8       So I understand that there are only two meetings

9  that we're talking about, but I want to be clear.  The record

10 is not what you have said it is.

11      MS. LOUIS-JEUNE:  I respectfully disagree, Your

12 Honor.  You know, there were two meetings.  He was at a

13 meeting.  That is the extent of what we have been told at

14 this time.  We have not gotten discovery.  We are not in a

15 position to, you know, fight against these charges in a

16 meaningful way at this moment.

17      I would ask that my client be given the opportunity

18 to go home.  He does have a medical condition -- I don't

19 believe that was discussed in our papers extensively -- that

20 requires him to have regular checkups with his doctor every

21 three to six months.  There's a concern obviously about the

22 MDC's ability to make those happen.  And, you know --

23      THE COURT:  I will writ him out for those meetings.

24 Okay?  I'm the assigned magistrate judge, I believe, on this

25 matter.  I will writ him out for those meetings.  He may have

1  to be escorted by United States Marshals.  But let me be

2  clear.  I'm not going to put an 84-year-old man's life at

3  risk by relying on the MDC leadership to take him to medical

4  appointments.  So let's be --

5          MS. LOUIS-JEUNE:  Thank you, Your Honor.

6          THE COURT:  I want to be clear about that.  Okay?

7  And you are right.  It's difficult to fight charges.  It is

8  difficult to come up with evidence, et cetera.  But the place

9  the Court and pre-trial services takes confidence is in what

10  the nature of the package and the conditions are.  A $150,000

11  package secured by two suretors given the quantum of evidence

12  and the significant charges is not even close, unfortunately.

13          MS. LOUIS-JEUNE:  Your Honor, we would also be able

14  to propose a higher package of up to $600,000 secured by

15  three or four additional suretors.  I believe the suretors

16  are on the telephone right now.  The names and addresses of

17  three of them have been given to Sumay (ph.) and the others

18  would be available to speak with the Government or a

19  paralegal of the Government at any convenience of the

20  Government or the Court.

21          THE COURT:  That's certainly closer.  Okay.  But I

22  suggest -- for the reasons I've said already, I'm going to

23  deny bail.  But, you know, I would suggest that if the

24  meeting that your client had on September 20th is not as it

25  is indicated by the Government, you'll figure out what it is

1   and let the Court know because that directly undermines the

2   premise upon which the bail application is being made, which

3   is that he no longer is engaged in activity, that he does not

4   contact anyone even using rudimentary means, and he doesn't

5   direct anyone.  That is an essential plank to a release under

6   whatever bail package is proposed.  And that directly

7   undermines that.

8        And so you have this afternoon to meet with your

9   client.  If that's wrong in some way or a witness needs to be

10  brought forward for a bail hearing, that can happen.  So

11  something in the neighborhood secured by what you're talking

12  about or more, that's in the kind of area that would give the

13  Court some pause, provided the suretors are acceptable, et

14  cetera.

15       But you still have to overcome this fundamental

16  issue, which is the Court's trust in someone who has an

17  extensive, extensive criminal history and the charges against

18  him are quite, quite substantial.

19       So you can make another application.  I take your

20  point that you're in a difficult position not having spoken

21  to your client, but I will take whatever steps you need so

22  that you can have those conversations.

23       But for the reasons stated, I'm denying bail.

24       MS. LOUIS-JEUNE:  Thank you.

25       THE COURT:  Sorry.  You're muted or I couldn't

1   hear.

2         MS. LASH:  My apologies, Your Honor.  I said

3   nothing further.  Thank you.

4         THE COURT:  So a permanent order of detention is

5   entered with leave to --

6         THE CLERK:  Judge, sorry.  This is Sumay.  So it

7   continues because one was entered already.

8         THE COURT:  Okay.  That's fine.

9         THE CLERK:  Okay.  Okay.  Thank you, Judge.

10        THE COURT:  Ms. Louis-Jeune, I expect both on the

11  medical conditions and access to your client, I can't do it

12  unless I'm told.  So if you want to me to take the steps I'm

13  prepared to take, number one, I suggest you loop in Ms. Lash

14  so she can take whatever actions she's able to take and then

15  make the necessary applications to me (indiscernible).

16        MS. LOUIS-JEUNE:  Thank you.

17        THE COURT:  Wish everyone well.  Have a nice day.

18     (Proceedings adjourned at 1:42 pm)

19

20

21

22

23

24

25

TRANSCRIBER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Carrie Clouse*                    October 16, 2021

_____          _____

Carrie Clouse, CET-1207               DATE

Legal Transcriber