

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

TH:DEL/MWG/ADR                     *271 Cadman Plaza East*
F. #2020R00637                              *Brooklyn, New York 11201*

January 12, 2024

By ECF

The Honorable Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Benjamin Castellazzo
     Criminal Docket No. 21-466 (S-1) (HG)

Dear Judge Gonzalez:

  The government respectfully submits this letter in advance of sentencing in the above-referenced case, currently scheduled for January 22, 2023. On July 7, 2023, the defendant Benjamin Castellazzo pleaded guilty to money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h), in connection with an extortion scheme he directed as the underboss and longtime member of the Colombo organized crime family of La Cosa Nostra. For the reasons below, the government respectfully requests that the Court impose a sentence at the high end of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range calculated in the defendant's plea agreement and stipulated to by the defendant, 21 to 27 months' imprisonment.

I. Background

  A. The Offense Conduct

  The defendant's conduct is set forth in detail in the Probation Department's Presentence Investigation Report, dated October 24, 2023 and amended on November 20, 2023 ("PSR"). Upon his arrest in 2021, Castellazzo was the underboss of the Colombo crime family, a criminal enterprise that engages in violent crimes, extortion, loansharking, drug trafficking and fraud, among other things. PSR ¶¶ 15, 19. This case arose from an investigation initiated in July 2020 by the Federal Bureau of Investigation ("FBI") and other law enforcement agencies into the extortion of a senior official of a Queens, New York labor union (the "Labor Union") by members of the Colombo family. Id. ¶ 6. As described below and in the PSR, the extortion involved threats of violence toward multiple victims connected to the Labor Union and an associated health fund (the "Health Fund").

1. <u>Extortion and Laundering Scheme</u>

The PSR details the breadth and nature of the Colombo crime family's extortion scheme against the Labor Union's senior official, who is referred to in the Superseding Indictment in this case as John Doe #1. The extortion began in 2001 and involved Colombo crime family captain Vincent Ricciardo and other Colombo members collecting $2,600 monthly from John Doe #1's salary, a sum which Ricciardo sometimes referred to as a "pension" for himself from the Labor Union. PSR ¶¶ 33-34. In 2020, members and associates of the Colombo crime family approached John Doe #1 in a grocery store, appeared at his home while his family was present, visited his Labor Union workplace, forced him to attend meetings with members of the crime family, and repeatedly and frequently called and texted him in connection with the extortion. PSR ¶¶ 33-48. Between 2001 and 2020, John Doe #1 paid more than $600,000 to the members of the Colombo crime family in connection with the extortion. PSR ¶ 45. Bank records obtained from financial institutions since 2010 corroborate these payments. <u>Id.</u>

In 2020, members of the Colombo crime family expanded the demands on John Doe #1 and sought, among other things, to: (1) force the Labor Union's management to make decisions that benefited the Colombo crime family, including the hiring and employment of a co-conspirator and ultimately a cooperating witness ("Co-Conspirator #1") as the assistant administrator to the Health Fund; (2) manipulate the selection of the Health Fund's vendors so that the Health Fund would contract with entities and individuals associated with the Colombo family; and (3) divert more than $10,000 per month from the Health Fund's assets to members of the Colombo family. <u>Id.</u> ¶ 29.

In December 2020, as Vincent Ricciardo and other members of the Colombo crime family demanded, John Doe #1 hired Co-Conspirator #1 as an assistant administrator and agreed to pay him $144,000 per year, in addition to other payments to Ricciardo. PSR ¶ 58. In early 2021, after Co-Conspirator #1 was installed in his new position at the Health Fund, Vincent Ricciardo directed Co-Conspirator #1 to obtain all vendor contracts on file at the Health Fund as well as information and paperwork on the Health Fund's trustee meetings and Heath Fund plan participants. PSR ¶ 59. The investigation revealed that over the course of the next several months, Vincent Ricciardo and the members of the Colombo crime family sought to use their control over the Labor Union to replace the Health Fund's vendors and Labor Union's legal counsel with entities beholden to the Colombo crime family and its associates. PSR ¶ 60. Those vendors would then pay a monthly fee, or "kickback," to the crime family. <u>Id.</u>

From 2019 through 2021, Castellazzo helped direct and oversee the scheme to extort and infiltrate the Labor Union. For example, in 2019, Castellazzo was involved in mediating and overseeing the crime family's early efforts to siphon money from the Health Fund. On November 10, 2020, Castellazzo attended a meeting at a restaurant in Brooklyn with other members of the Colombo family leadership in which they discussed the extortion scheme and decided that at least $10,000 per month from the Labor Union or Health Fund would need to be kicked up to senior leadership. <u>Id.</u> ¶ 57. In April 2021, the Colombo family placed Castellazzo directly in charge of the extortion of the Labor Union and the Health Fund. <u>Id.</u> ¶ 76. On or about April 13, 2021, Castellazzo met with Vincent Ricciardo at an autobody shop in Brooklyn to discuss the removal of a consultant to the Health Fund. <u>Id.</u> On or about April 20

and 27, 2021, Castellazzo met again with Ricciardo to receive reports about the extortion scheme. Id. ¶ 79, 81.

In June 2021, Castellazzo received a portion of one payment purportedly provided to the Colombo crime family from a consultant to the Health Fund (the FBI actually provided payment). At law enforcement's direction, Co-Conspirator #1 delivered an envelope containing a cash payment of $12,000 to Vincent Ricciardo and informed him that the money was from a consultant to the Health Fund who said: "I don't want anything to happen to my wife and brother." PSR ¶ 97. Vincent Ricciardo notified Colombo consigliere Ralph DiMatteo, who then discussed accepting the payment with the senior members of the crime family. Id. On June 29, 2021, in a Franklin Square parking lot, DiMatteo collected the money from Vincent Ricciardo and subsequently traveled to the Brooklyn garage to meet with other members of the crime family, including Castellazzo. Id. Castellazzo received $1,000 from the payment the crime family members believed to be extortionate.

2. Attempts to Obstruct Justice

Castellazzo attempted to obstruct the government's investigation soon after he was charged. Just days after his arrest, he began calling individuals from the Metropolitan Detention Center ("MDC") in Brooklyn and instructing them to remove items from his apartment and to destroy his mobile phone, among other things. Id. ¶ 144-46.[1]

B. Procedural History

A grand jury in this District returned an indictment against Castellazzo and others on September 8, 2021. The defendant was charged with racketeering, in violation of 18 U.S.C. § 1962(c) (Count One); Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (Count Two); Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Three); Hobbs Act extortion conspiracy, in violation of 18 U.S.C. § 1951(a) (Count Four); attempted Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Five); money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Thirteen); conspiracy to steal and embezzle health care benefit funds, in violation of 18 U.S.C. §§ 371, 664 and 669(a) (Count Fourteen); health care fraud conspiracy, in violation of 18 U.S.C. §§ 1349 and 1347 (Count Fifteen); and attempted health care fraud, in violation of 18 U.S.C. § 1347 (Count Sixteen).

On April 13, 2022, a grand jury returned a 21-count superseding indictment, which is the operative charging document in this case and contained the same essential counts against Castellazzo. On July 7, 2023, the defendant pleaded guilty, pursuant to a plea agreement

---

[1] In his January 3, 2024 sentencing submission, see ECF Dkt. No. 605 ("Def. Mem.") at 2-4, the defendant disputes the PSR's characterization of these calls as obstructive and instead asserts that his intent was merely to "donate or dispose of items in his apartment" that he no longer needed. The Court should take the defendant's actions and their obvious implications at face value. The defendant does not dispute that the calls as described in the PSR occurred, and therefore the PSR should remain unchanged.

3

with the government, to Count Thirteen of the superseding indictment, charging money laundering conspiracy. PSR ¶ 1.

  C.  Guidelines Calculation

  The government calculates the defendant's offense level as set forth below and in the PSR, ¶¶ 187-197, 266A:

Money Laundering Conspiracy

  Base Offense Level (§§ 2S1.1(a)(1), 2B1.1(a)(2))  6

  Plus:  Convicted Under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B))[2]  +2

  Plus:  Intended Loss More Than $150,000 (§ 2B1.1(b)(1)(F))  +10

  Plus:  Manager or Supervisor (§ 3B1.1(b))  +3

  Less:  Acceptance of Responsibility (§§ 3E1.1(a), (b))  -3

  Less:  Global Resolution (§ 5K2.0)[3]  -2

  Total:  <u>16</u>

Because the defendant is in criminal history Category III, the resulting Guidelines range is 27 to 33 months' imprisonment.

  This Guidelines range differs from the one calculated in the PSR in one respect. The PSR places the defendant in Criminal History Category II based on a criminal history score of three. PSR ¶ 205. This was calculated solely from the defendant's January 2013 sentence following a racketeering conspiracy conviction in this District. Id. ¶ 203. However, the government submits that the defendant in fact has a criminal history score of six, placing him in Criminal History Category III. This calculation includes not only the January 2013 sentence but also the defendant's February 2002 sentence following an extortion conspiracy conviction in this District, for which he remained in custody until December 7, 2004. Id. ¶ 202. Because the government can demonstrate that the defendant's commencement of the instant offense of conviction began before December 7, 2019, his February 2002 extortion conspiracy sentence lasted within the 15-year timeframe prescribed by the Guidelines and properly receives three criminal history points. U.S.S.G. § 4A1.2(e)(1); <u>see also</u> <u>United States v. Napoli</u>, 179 F.3d 1, 17

---

[2]   The government erroneously did not apply this enhancement when calculating the defendant's offense level in the plea agreement, but the enhancement is applicable. <u>See</u> PSR ¶ 189.

[3]   The parties agree that the conditions in Paragraph 14 of the defendant's plea agreement have been met and that the two-level reduction under U.S.S.G. § 5K2.0 for entering into a global resolution should be applied. <u>See</u> PSR ¶ 266A.

4

(2d Cir. 1999). In his executed plea agreement, Castellazzo stipulated that his criminal history placed him within Criminal History Category III for purposes of this case.

II.   The Appropriate Sentence

   A.   Applicable Law

The standards governing sentencing are well-established. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court rendered the Guidelines advisory, and emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. Id. at 264; see also United States v. Kimbrough, 552 U.S. 85 (2007) (stating that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence").

However, that the Guidelines are non-binding does not render them irrelevant to the imposition of an appropriate sentence. In Gall v. United States, 552 U.S. 38, 128 S. Ct. 586 (2007), the Supreme Court instructed that the sentencing court should calculate the Guidelines range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors. Id. at 596-97. In so doing, the court "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." Id. at 590.

The Supreme Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." Id. (noting that a "major departure should be supported by a more significant justification than a minor one"). When "rendering a sentence, the district court must make and place on the record an individualized assessment based on the particular facts of the case." United States v. Carter, 564 F.3d 325, 328 (4th Cir. 2009). Ultimately, the court "must state in open court the particular reasons supporting its chosen sentence." Carter, 564 F.3d at 328 (quoting 18 U.S.C. § 3553(c)).

Title 18, United States Code, Section 3553(a) provides that, in imposing a sentence, the Court shall consider:

>   (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
>   (2) the need for the sentence imposed—
>
>   >   (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>   >
>   >   (B)   to afford adequate deterrence to criminal conduct; [and]
>   >
>   >   (C)   to protect the public from further crimes of the defendant.

5

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, 18 U.S.C. § 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

B.	Argument

The government respectfully submits that a sentence at the high end of the Guidelines range calculated in the plea agreement, 21 to 27 months' imprisonment, is sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. In particular, a sentence at the high end of the range is appropriate in view of the serious, long-running nature of the conduct, the defendant's recidivism and leadership of a violent organized crime family, the significant harm to victims, and the need for deterrence.

1.	The Nature and Circumstances of the Offense

The defendant's crimes were very serious on account of their predatory nature, the length and repetitiveness of the conduct, and in view of the violent nature and reputation of the Colombo crime family. Colombo members relied upon the crime family's reputation for violence in their dealings with John Doe #1 and others. Such acts were not taken hastily, but with years of understanding and knowledge about the significance of their actions. The serious and long-running nature of the criminal conduct here, as well as its nexus to a violent organized crime enterprise, warrant a significant term of imprisonment. See 18 U.S.C. §§ 3553(a)(1), (a)(2)(A).

The extortion and laundering scheme in this case continued for years and involved demands on John Doe #1 to make regular payments to Vincent Ricciardo for an unearned "pension" that amounted to nothing more than an organized crime tax on John Doe #1's earnings. John Doe #1 acquiesced to the demands (until he didn't under the protection of law enforcement). Moreover, in 2021, as law enforcement's interdiction efforts increased, the Colombo family members made clear their intention to harm John Doe #1 as they saw their efforts failing to achieve the desired results.

In his role as underboss, Castellazzo directly oversaw and profited from the scheme and from the crimes committed by those below him. Without a hierarchy, of which the defendant was a critical senior member, structured criminal organizations like the Colombo crime family could not thrive or even survive. Members and associates of the crime family could not commit the bread-and-butter crimes of the mafia such as extortion and loansharking, if not for senior leaders like Castellazzo.

Moreover, as described above, the defendant attempted to obstruct the government's investigation soon after he was charged by asking others to remove items from his apartment and to destroy his mobile phone, among other things. The defendant's attempts show a blatant disregard for the law and for the justice system.

### 2. The Defendant's History and Characteristics

That same disregard is also apparent from the defendant's lifetime of criminal recidivism and sworn membership in La Cosa Nostra. The defendant's history and characteristics weigh in favor of a significant sentence. He simply has not been deterred in any way by past punishment for similar offenses. Most significantly, Castellazzo has prior convictions for his association with the Colombo crime family involving extortionate collection of credit conspiracy and racketeering. In his most recent federal conviction, in 2013, Judge Matsumoto sentenced Castellazzo to 63 months' imprisonment for racketeering offenses. PSR ¶ 203. Prior to sentencing in that case, the defendant wrote in a letter to Judge Matsumoto, "I can tell Your Honor in all sincerity that you will never see me before this or any other court of law again." United States v. Castellazzo, 11-CR-030 (S-1) (KAM) (E.D.N.Y.), ECF Dkt. No. 1061-1 (attached as Exhibit A) at 2. Nevertheless, the defendant reoffended.

The defendant's history includes four additional convictions. In 2002, Castellazzo was sentenced by Judge Glasser to a three-year term of imprisonment based on his conviction for conspiring to collect extortionate extensions of credit. That crime was committed while Castellazzo was a captain in the Colombo crime family, and the extorted money reflected payments for credit, gambling and other criminal activity conducted at a social club owned and supervised by Castellazzo. Id. ¶ 202.

In 1995, the defendant was sentenced to an eight-month term of imprisonment following a conviction for operating an illegal gambling business. That conviction was based on Castellazzo's participation in a business that, under the auspices of La Cosa Nostra, held craps games, conducted illegal numbers betting operations and accepted wagers on sporting events. Id. ¶ 201. In 1976, Castellazzo was sentenced to a four-year term of imprisonment following a conviction for the unlawful use of a telephone in the commission of a felony. That conviction was based on Castellazzo's role in a heroin importation and distribution ring. Id. ¶ 200. And before that, in 1959, the defendant was sentenced to a four-to-eight-year term of imprisonment following his conviction for grand larceny. That conviction was based on his theft, with others, of a tractor-trailer truck containing carpeting. Id. ¶ 199. Castellazzo has demonstrated time and again that, as a sworn lifetime member and high-ranking leader of the Colombo crime family, he has no intention of leading a law-abiding life.

The defendant argues that his age and health conditions weigh in favor of a below-Guidelines sentence. See Def. Mem. at 4-5. As he concedes, these conditions have been addressed with past treatments and surgeries, some have subsided entirely, and others are currently being treated, including with medications. Id. There is no indication that any of his health conditions cannot adequately be handled by the Bureau of Prisons during his incarceration just as those of countless other inmates have.

Significantly, the defendant's alleged health issues certainly have not prevented him from committing crimes or assuming a high-ranking position in the Colombo crime family, all in the very recent past. A sentence that places undue reliance on the defendant's health would ignore his long history of committing crimes and would thwart the other purposes of sentencing, such as reflecting the seriousness of the offense, promoting respect for the law, providing just punishment and providing deterrence. Moreover, given the defendant's position as underboss of

the Colombo family, his health likely will not prevent him from committing more crimes in the future because he can continue to direct others to carry out crimes and pay him the proceeds of those crimes.

Indeed, the defendant cited his health as a factor when Judge Matsumoto sentenced him in 2013 and before that when Judge Glasser sentenced him in 2002, see e.g., United States v. Castellazzo, 00 CR 840 (ILG) (E.D.N.Y.), February 27, 2002 Sentencing Transcript (attached as Exhibit B) at 4. He nonetheless received significant sentences in both instances, and subsequently reoffended.

        3.        Promoting Respect for the Law and Providing Just Punishment

The sentence must also promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). By engaging in continued criminal activity for the Colombo family spanning decades, Castellazzo has evidenced an utter lack of respect for the law and for the authority of courts in this District. For the same reasons discussed above, his conduct warrants a significant sentence.

        4.        Affording Deterrence and Protecting the Public

The defendant's sentence must also afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. See 18 U.S.C. § 3553(a)(2)(B), (C). The defendant is a sworn member and leader of a violent organized crime family and faces a strong incentive to continue to commit crimes for that family after his release from prison, even considering his age, as he has done in the past.

There is also a clear need to send a broader message that participating in organized crime and supporting such criminal enterprises warrants serious punishment. See e.g., United States v. Davis, 08-CR-332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010) ("Under section 3553(a)(2)(B), there are two major considerations: specific and general deterrence.").

IV.   Conclusion

For these reasons, the government respectfully requests that the Court impose a sentence at the high end of the Guidelines range of 21 to 27 months' imprisonment set forth in the plea agreement.

Respectfully submitted,

BREON PEACE
United States Attorney

By:   /s/
Devon Lash
Michael W. Gibaldi
Andrew D. Reich
Assistant United States Attorneys
(718) 254-7000

cc:   Clerk of Court (HG) (by ECF)
Ilana Haramati, Esq. (by ECF)
Michel Marinaccio, Esq. (by ECF)
United States Probation Officer Jeremy Toner (by E-Mail)